Good morning. Okay, good morning. If you want to make a rebuttal argument, you should stop before your full 20 minutes. Yes, sir. Except if you would tell me what you intend to do. I'd like to reserve 8 minutes for rebuttal. I'll try to remind you that you should watch the clock yourself. I shall. Good morning. I'm James McNaughton. I represent the appellant, the Satanic Temple, Inc., which I will refer to as TST. This case is about coerced motherhood and money. The state of Idaho can ban abortions from conception, subject to two very important caveats. Number one, if it results in a woman becoming a mother without her consent, it's a violation of the 13th Amendment. The state of Idaho has two options to avoid that. Number one, give her the opportunity to opt out, or number two, make the delivery of an unwanted child a service to the state, in the same way that military service is a service to the state. If your labor is taken by the state for the benefit of the public, it's not involuntary servitude. But the state of Idaho has not done that in this case. The second limitation is compensation. The uterus is property. You can lease it out. You can give it away. People are making literally tens of thousands of dollars by being gestational carriers. It has an economic utility in its own right. And if you take that economic utility away from the woman, the Fifth Amendment requires that you pay just compensation. Dobbs is only the starting point for addressing these issues. Dobbs has them. Before we jump to the takings and the 13th Amendment, I have some questions on standing, as you might appreciate. As I understand, your client has a number of members in Idaho, and this teleclinic is operated out of New Mexico. Is that right? That's correct. Okay. So the first question relates to associational standing. Although you allege that you have these members in Idaho, no member is named who would be a potential plaintiff here. And it would seem to me that, at least on that basis, you couldn't have associational standing. So maybe you can explain to me how you think, what have you alleged that give you the predicates of associational standing?  There's a practical problem here that I'd like to point out to you first, okay, which is that there is a lot of fear out there. To find a woman who will stand up as a Jane Doe, I can tell you from personal experience, is extraordinarily difficult, because I have to promise that woman that she will remain anonymous. We understand that, and we go back to Roe v. Wade for how that came about. I can't guarantee that. And so what I say to her is, here are your choices, all right? If it comes to it, you might have to disclose your name. And you have the choice of saying, I'm not going to do that, in which event I get dismissed, and the efforts that I've put in up until now are for naught, okay? But if you were willing to stand up and take that risk, I will represent you. I don't have any takers. And this is not the only instance where I've encountered that in this country. So here's the next step. I need an involuntarily pregnant woman. They exist. If you drew a line five miles out from this courthouse and did a radius, there are, sight unseen, dozens of involuntarily pregnant women. It's just a matter of biology and fact. Singleton case says you can create a class of women who either are or imminently will become, over the course of the year, pregnant. That's going to happen. That's reality, all right? The question becomes, how many people do you need to have that class? Fifty? I don't think so. But if you have 1,750, I have a doctor who is given a medical opinion, which would have gotten me to a jury if I'd had a fact trial. Medical opinion, that, to a reasonable degree of medical certainty, that number is 1,750, and it will produce, every year, 27 involuntarily pregnant women. That's just the fact. That's what happens in real life. So can I name that woman? No, I can't. And even if I could, I wouldn't tell you who she was because she's afraid to step forward and come into this world. And I totally understand that concern, and am incredibly sympathetic to every potential client that you have that would fall in that category. So we do have cases, of course, that deal with your issue, in the Mi Familia and other cases, where there's a clear case that someone would be affected as opposed to speculative, then there is some leeway in terms of naming an individual. But the question here is whether the harm at this stage is only speculative. Well, it's not because the harm is to TST. TST has made an affirmative decision to not provide its services in Indiana. This is not an organizational standing case. Indiana or Idaho? I'm sorry, Idaho. I have a case in Indiana.  You'll have to put me in Indiana, I think, for all I know. I just want to stick closer to the Ninth Circuit. I'm trying. I'm trying. Illinois starts with an I. Yeah, right. Maybe we have nationwide jurisdiction. I don't know. But we'll stick to the Ninth Circuit for now. In today's world, who knows, right? We have standing, separate and apart from organizational standing, as a provider of abortifacients because we have made an affirmative decision not to provide them in Idaho. That is precisely four square within Doe v. Bolton, Planned Parenthood of Idaho versus Wasden, and McCormick versus Herzog. We have curtailed our liberty interest. When we were planning to build this clinic, we made this affirmative decision. We could have gone out, and actually have since, go out and find an Idaho-licensed physician to provide services and do the things that we actually need to practically do in order to deliver this. But the risk of doing that, what's the point if you're going to go to jail after you've set it up to provide abortions? We also, separate and apart from our standing as a provider, have standing as a religious organization. The Satanic Temple promotes the satanic abortion ritual, a statement that a woman can make while having an abortion to alleviate guilt and shame. Unable to provide that anymore in Idaho because there are no more abortions. That is an injury. Now, whether it complies with the current standards under Haven's Realty kind of remains to be seen because of the recent vacating of the Arizona v. Mays case about what the standards are for this kind of standing. But we certainly have lost the ability to do something that was a preexisting process, preexisting right that TST did, which was promote this abortion ritual. Now, do we need, in addition to that, to have some kind of, I don't know, diversion of resources? That question remains to be seen. But if we do, then, yes, we have. TST has spent over $100,000 to set up this clinic with the objective of providing abortion services throughout the United States and specifically providing them to its TST members. So we've got three different legs to stand on for the standing. I will grant you that my singleton theory is probably the most aggressive of the three theories. But it's a valid theory. The case law is there. The reality is there. There are women who are being coerced into becoming mothers in the state of Idaho as I stand here today, and some of them are TST members. So we have standing. Where in the record do we see that your clinic has calls from Idaho? Is that in the record? Has what? Has calls, received calls from Idaho. No, we don't take calls from Idaho. But see, we're kind of in this mobia, this loop of, well, we don't take the calls, so we think there's people there, but we don't know who they are. We can't identify them. It keeps moving more speculative in terms of your services. We know the people are there. I understand you have that clear belief, but we have to get a little bit beyond that for standing, according to the cases. You say people are there. What case says people are there is enough. Going back to the membership standing, okay? Okay. And that this concern about having an actual patient does not apply for the other legs upon which we rely. We don't have to have an actual client in order to have standing as a provider. There was no actual customer or patient in any of those cases that I cited. They were all potential customers. Okay? There's nothing that requires, in terms of our standing as a religious organization, it's just you can deduce from the fact that before there's an abortion ban, you can provide the abortion ritual in Idaho. Once you have passed the abortion ban, done. It's not going to happen again. If I could jump in just so I can better understand your standing theory, and I know you've got a few different theories that we can consider to get you past this problem. Yes. But let's say the University of Idaho Alumni Association wanted to challenge this law. I assume under your theory they could challenge it because they would say, look, we're the alumni association. We have our young alumni association section. We have women in there from 21 to 35. So under your theory they could.  So it doesn't have to be a provider in another state. Absolutely. That's the whole point of organizational standing. From the ACLU on is that individuals can get together, get with a group, and have the group represent their interests without having to actually show up and become a plaintiff. And it gives them some buffer, as it were, in the classic case of the ACLU, a buffer between the state and the individual. The question is, how speculative is it that these people are there? Just by virtue of your example. You've got a large enough number, you've got enough people. So how big is the number? How big is the number? How do you determine that? I tried to determine it by expert testimony. Got shot down. Without adultery. They're free to come in and say, no, this is just totally speculative. There are no people out there. Fine. Bring your expert in. Sit them down. Let me ask them about the birth rates in Idaho, the abortion rates in Idaho. You know, depends on who you talk to, but the number of women who are becoming mothers by coercion, it depends on who you talk to, but it's anywhere from 20% to 40% of pregnancies. It's a serious problem. I'd like to reserve the rest of my time for rebuttal, if I may. Sir. Jason. Well, you're here from Council for Appellees now. Is that Mr. Hurst? Yes. May it please the Court. I'm Alan Hurst here for Attorney General Labrador and Ada County Prosecuting Attorney Jan Bennett. Two points for me this morning. The first one that we haven't heard yet about is redressability, that none of Satanic Temple's harms are redressable, because even if they win everything they want in this case, they still can't ship abortion pills to Idaho. And the second point is speculation, which we have heard a little bit about, which all of their harms are speculative under all of their theories, because they have no proof that they have any members of the Satanic Temple in Idaho who are involuntarily pregnant or will be in the near future and who want an abortion. So as to redressability, the problem here is the unchallenged independent legal barriers. And most importantly, there's licensing requirements, and there's also, of course, the requirement of an in-person exam and then a follow-up appointment. These things need to happen in person. They don't have facilities to do this in person. They have no plans to get facilities to do this in person. Their only response in their reply is they say, well, once we get an injunction against these laws, let me quote, TST can then turn its attention to how it will address any other legal impediments to providing abortive patients by telemedicine in Idaho. In other words, they have no idea whether they have valid challenges to these other barriers. They're just saying, we're going to do this piecemeal. We're going to do this one at a time. And if it turns out that the other laws, the privileges from doing this are constitutional, I guess we tried. I don't know what they would say in that situation. Well, what if they had an individual identified who is a member of the Satanic Temple and lives in Idaho, and she's two months pregnant as a result of an unwanted pregnancy, so she falls right in their category? Why wouldn't that at least give them standing to challenge the law as it sits down? Two answers to that. One legal and one factual, I would say. The first legal answer is that no remedy given to Satanic Temple could redress that woman's injury, because even if the court said, speaking of the district court, even if the district court said nobody in Idaho can enforce the abortion ban against you, there's still no order saying that you can do away with the requirement of the in-person visits. And so there they are in a situation. Either the woman has to go to New Mexico, in which case Idaho law doesn't apply to begin with, or Satanic Temple has to go up to Idaho, which they haven't alleged they're willing to do. So the remedy would still not redress the woman's harm in that case. The factual response is that, in fact, Satanic Temple requires people to come to New Mexico anyway. This was admitted at the hearing below on pages 48 and 49 of the record, that counsel admitted that no matter what state a woman is from, they will only provide abortion pills if she has her telehealth appointment while she is physically present in New Mexico, and they will only ship the abortion pills to mailing addresses in New Mexico. And it's not entirely clear why they limit themselves to this, but it seems further proof to me that there's no redressability here because we have a wide variety of abortion laws in this country. We have strict bans like Idaho's. We have no bans. What you're saying is if somebody, immediately after a situation, believes that she needs a pill, that she would need to come under the Satanic Temple's proviso, she would have to go to New Mexico, not Idaho. That's correct. They're not shipping, of course, pills to Idaho. That is correct. They're not shipping pills to Idaho. They're not shipping pills to California. They're not shipping them to Washington, Colorado, all sorts of states where the services they want to provide are perfectly legal. It is their admission in the hearing below that they do not ship pills to those states either. And so I just don't see how their goal is to move Idaho from the strict ban category into a somewhat less strict ban category, but we already have states who are in these less strict ban categories, and they don't send pills there. So I don't see how an order of the court can create a situation where they will be willing to ship a pill to Idaho. It's just not going to happen. Their response and their reply to our addressability argument is that they cite Matsumoto, a case which I imagine Your Honors are familiar with, and in Matsumoto, partial relief was enough. And they say, well, this is partial relief. They say, you know, once we invalidate this law, we can go after the other laws. But that's not the kind of partial relief that Matsumoto. That's not what happened in Matsumoto. It was a single statute with multiple parts, correct? Correct. And some of those parts overlapped with independent prohibitions that weren't challenged, but other parts didn't. And so an order in that case, while it might not give them everything they wanted, it gave them something. After that order, there were actions that they could legally take in Idaho that they could not legally take beforehand. This isn't a partial relief case. This is a no-relief case. There is no order that the district court could have entered that would let them do one thing in Idaho that they couldn't before the district court entered the order. That's advisory opinion territory. That's not a case for controversy. No addressability, no standing. So turning to this speculation issue that's been talked about earlier, just to walk through their chain of statistics and emphasize how speculative it is, they start with the Idaho rate of pregnancy, like annual rate of pregnancy for women in Idaho. And they give no evidence that their members in Idaho have the same pregnancy rate. They just assume that. The next step is they give the national rate of unintended pregnancies, and they give the national rate of birth control failure. Once again, no evidence that these rates apply equally to Satanic Temple members. Once again, and even further, no evidence that these national rates even apply to Idaho generally. And then they get a number at the end, and the number they give us in their opening brief is 27, which is already not especially high for an annual figure. But then we pointed out some problems with their theory in our brief, and in their reply brief at page 21, they admit, yeah, actually it's three. Actually, at the end of our chain of probabilities, we have the number of three women who are involuntarily pregnant. And then they still don't take the next step. They still don't give us any information about what percentage of involuntarily pregnant women actually want abortions. And so it could very easily be zero. If any of their statistics are off, which they could easily be, the number of involuntarily pregnant women could also be zero. So this court doesn't need to figure out how mi familia relates to Associated General Contractors and to Summers, because even under mi familia, this doesn't work. Mi familia says you need a name of an identifiable individual who's harmed unless it is clear and not speculative that people are in fact harmed. And I look at this and say this is completely unclear. This is entirely speculative. This wouldn't have satisfied mi familia, and it certainly wouldn't have satisfied Summers. The theory we heard a moment ago about once you get enough people, you must have standing, for one, that's a dangerous theory because there are some organizations with a lot of people in this world. The AARP, I think, has 40 million members. By their theory, they would be able to challenge basically every law in the United States. But this once-you-have-enough-people theory was rejected by the Supreme Court in Summers. The Sierra Club said, effectively, we have hundreds of thousands of members. They're involved in the Sierra Club. We know that because they're involved in the Sierra Club, we expect they're probably going to visit national parks and national forests. And if enough of them visit national parks and national forests, then some of them are certain to come across locations in those forests that have been affected by the policy we're challenging. And the Supreme Court said, no, that's not good enough. It said, let me see, the requirement of naming the affected members has never been dispensed with in light of statistical probabilities. And that's all we have here. Their argument to distinguish Summers is, well, we give numbers. We have stats. We have percentages. And whereas Summers just kind of eyeballed it. But it's still statistics. You look at Mi Familia Vota, you will see no statistics. So statistics don't do it. They need a name. They don't have one. The final point I'd like to make on this issue. Let me ask about had they affirmatively said, we have all the infrastructure, we have the members, we will set up an abortion clinic in Idaho to dispense these pills. Except right now we would be criminally prosecuted. But we intend to do that. Would that be a different case? It would certainly be a different case. Oh, certainly, obviously a different case. But would that give them enough foundation to allege standing if they actually had an intent to proceed with the infrastructure to violate the statute? So defining what level of intent is needed is, you know, more of an art than a science, right? It's a bit messy. I think it's Lujan that has the notion of if you're affected by environmental policies in another country, you don't need to actually buy the ticket to go to that country, but it needs to be more than I'd like to visit someday. And where you draw the line between those two is pretty difficult. The cases this court has seen, abortion cases out of Idaho this court has seen, which there have been, you know, more than a few. Quite a few.  Notice that, you know, those cases are all, we have doctors in Idaho. We provide abortions in Idaho. We have patients in Idaho, right? So that's clearly enough. Now, if it's... Don't even, as I understand it, there's only a nurse practitioner in New Mexico? I think she's, I'm not sure she's even a nurse practitioner. It's an APRN, which is an advanced practice registered nurse. But she's not an MD. Not an MD, is my understanding. And, you know, Idaho law says physician for, you know, who can perform abortions, and that provision isn't challenged either. So where exactly the line is, you know, the Thomas case that has factors that this court uses to, you know, sort of give more detail to the dry house factors says a concrete plan. So, yes, at some point, their plan would be concrete enough and their intention would be clear enough to build that clinic in Idaho that we would have to say, yes, they have standing. I don't know exactly what that point is, but it's certainly well north of where we are here. He raised at the end of his argument the question about that this fundamentally is religious discrimination. What is your response on that? Well, they did plead a religious claim below an Idaho State RFRA claim. They did not defend it at the motion to dismiss stage. They asked leave to replead, remove that claim, and replace it with a First Amendment claim. Leave was denied. They haven't appealed that decision. So as far as on the merits, they've not addressed that. Okay, I thought that was the case, but I just wanted to hear what the procedural posture was. Thank you. That's correct. Then as far as they talked about their three-legged stool, you know, we've talked about two of those three legs thus far as I've been up. You know, we've talked about associational standing. We've talked about sort of organizational or pre-enforcement type standing. They've also talked about the diversion of resources standing. And as we've argued in our briefs, we don't think diversion of resources is a valid theory anymore. Exactly how that's going to play out in the Ninth Circuit will be decided, I'm sure, by the pending en banc case that was just announced last week, I think. But... I think the Supreme Court was pretty clear that diversion of resources standing is no longer a thing, that Havens Realty is just a normal standing case. The notion... Havens Realty was not because of... they had a social mission that was frustrated. It was they had an activity they were doing. They were providing counseling, and the people they were suing had interfered with their provision of counseling. And in that case, an organization would have standing, regardless of whether it has some abstract purpose or any diversion of resources or what have you. But once again, that's not this case. Their argument in their reply brief is that... that they have a pre-existing core activity of promoting the satanic abortion ritual in Idaho, but they have no evidence that any pre-existing core activity of that sort actually existed. So far as the evidence they have given us shows, the satanic temple... excuse me, the satanic abortion ritual has never taken place in Idaho. And they have done nothing specifically in Idaho to promote it there. They can't identify anybody who is interested in Idaho beyond being able to say we have a certain number of members. And once again, in fact, we know that the clinic does not have a pre-existing activity of providing abortions in Idaho because the clinic only provides abortions to people who are physically present in New Mexico. So if the court has no further questions... I just wanted to actually thank you for your 28-J letter. No, because a lot of times... I know that case didn't come out maybe the way that you were hoping for this case, but at least you acknowledged it and explained why you should still prevail. And a lot of lawyers don't do that. So it's actually encouraging to see someone do the right thing, which is what you did with that letter. I appreciate, Your Honor. I much prefer doing that to being blindsided when I get up here. Well, I agree. I mean, we always appreciate discussion of these recent cases because they may or may not support you. But you can't predict that in advance, right? Nope. Thank you. Thank you, Your Honors. I request that you affirm it. Okay. So we have some time for rebuttal. Why limit to New Mexico? Because nobody will go to jail. Very simple, okay? The plan was to create a clinic, and it uses the telemedicine model. And the way the telemedicine model works is you call up, you have a virtual consultation with an APRN. The APRN prescribes the pills. They get delivered by U.S. mail. Now, in New Mexico, that's in compliance with New Mexico law, and it's in compliance with the FDA requirements for the distribution of Mifeprestone. Now, what is the next step that we would have to take to provide service in Idaho? Get an Idaho licensed physician to be on the other end of that call and make that prescription. That's all we need, and we have that person. We had planned or had a contingency to get that person from the get-go, but we have not hired them because what's the point? What's the point of becoming licensed in Idaho? It's an act of futility. We're subject to the criminal penalties regardless of whether we're licensed in Idaho, regardless of whether we are APRNs, regardless of whether we are physicians. Now, counsel for Idaho says we have no redress if you strike down Section 605 as applied to involuntarily pregnant women. You still have to contend with having a facility. You still have to contend with getting a sonogram. The penalties for not doing that are found in Section 605.3, and they are the same as the penalties for Section 605.1. So, yes, we are asking for redress. We are asking to strike down those criminal penalties for those requirements, in-person examination, use of hospital facilities. The only other one that they pointed out was the doctor, and like I said, we've got a doctor. We can do this. This is not a someday proposition. We can put it in place by the beginning of next week easily. So the redress argument has no merit. We don't need a name. This Circuit recently held we do not need a name provided it's clear that somebody is being represented. And I come back to the practical issues that we face here. I would never, to be honest with you, I would never represent somebody from Idaho as a Jane Doe because I can't put her at risk. I can't put myself at risk. I cannot emphasize to you much. I've had these conversations over the years. I've been doing this now for about three or four years, and it's scary. People say, you know, I'd like to help you. You know, I'd like to stand up. I'd like to be counted. But I've got to practice. I have a medical practice I have to do. I have to live in this community. Okay? And that it's a circle back to the ACLU. The whole point of having an organization to represent you is so that you can conduct your business, your personal private business, your personal religious business, your personal medical business in private. All right? That's not an insult to the Constitution. That's not an insult to your authority. Okay? You just need to know there's one of them. Just one. Okay? There's at least three under his analysis of my data. Okay? Summers. Summers, Sierra Club says we've got 3,000 members. We've got 700,000 members. It's like you're with the Alumni Association. We have X number of members, therefore you can deduce from that there are X number of women, da-da-da-da-da. But if you started with your Alumni Association and you just simply said we've got 700,000 members under Summers, that would not be enough. You'd need to do something to show that some of those members wound up going to those parcels of land that were at issue in Summers. Well, how would you do that? You could ask your members. They might tell you. They might not. They might say, I don't want to get involved. Okay? Or you can take what you got. These statistics are government statistics. These are the statistics that the government uses to do its policy and its planning. These are not pulled out of thin air. They're real numbers, real numbers. And if you just do the math, you come down to 27. Or if you want to say you've got to use your birth control correctly, it comes down to 3. Okay? But as sure as I'm standing here talking to you, that person is there. And you know it. You know it. And you have to get to the point of saying, I'm going to grapple with these other issues, and they are substantial and they are huge. Okay? I'm going to take on these other issues because I'm going to say, you know what? This is so obvious. Somebody in this state represented by the Satanic Temple is being hurt by it. The Satanic Temple is being hurt. It cannot do its job. It cannot do its mission. And because it will go to jail. Unless you have any further questions, I have nothing further to say. Thank you. Thank you. Thank you, counsel. We appreciate the excellent argument on both sides of the case. The Satanic Temple case will now be submitted. And we will adjourn for the day.
judges: McKEOWN, GOULD, OWENS